O'DONNELL *v.* OLIVER IRON MINING. CO.

1. Mines and Minerals—Negligence—Subsidence.
    A mining company is admittedly liable for damages to surface owners if company negligently causes subsidence of their property.

2. Same — Disputed Elevation Readings — Question for Jury — Great Weight of Evidence.
    In subsidence action against mining company verdict for plaintiff *held*, not against great weight of the evidence where readings as to differences in elevation were disputed by engineers of the respective parties.

3. Evidence—Mines and Minerals—Subsidence—Distant Operations.
    In subsidence action against mining company operating three mines, admission of expert testimony as to effect of operations in mine most remote from plaintiff's property *held*, not error where judge instructed jury to disregard such testimony except as it threw light on the general nature, character and position of the formation of other two mines and that if subsidence occurred it must be found to be the result of such nearer operations.

4. Same—Cracks in Walls of Other Buildings.
    In action against mining company for damages to plaintiff's house, alleged to be due to subsidence, admission over objection of testimony as to cracks in wall of building located at least 500 feet away from plaintiff's house *held*, not alone sufficient to constitute reversible error, where it was somewhat cumulative in character and ordered excluded in judge's charge to jury although plaintiff failed to connect it up with defendant's mining operations as promised upon its admission.

5. Witnesses—Expert Witnesses—Activity in Case—Credibility for Jury.
    Activity and zeal of plaintiff's chief expert witness in working up case and evidence in subsidence case against mining company *held*, not to disqualify him from testifying but rendered his credibility and judgment a matter for jury's determination.

6. EVIDENCE—EXPERT TESTIMONY.

Expert evidence by a professional observer can be brought out other than by hypothetical questions.

7. APPEAL AND ERROR — OBJECTIONS — EXPERT TESTIMONY — HYPOTHETICAL QUESTIONS.

In subsidence action against mining company, error may not be granted on account of overruling an objection that expert testimony was inadmissible because not based upon hypothetical question although objection perhaps might have been valid if raised because witness was invading province of jury by giving conclusions instead of opinions.

8. EVIDENCE—EXPERT TESTIMONY—HYPOTHETICAL QUESTIONS—ASSUMPTION OF FACTS.

Hypothetical questions based upon disputed facts are not improper where questions fairly state such facts as proof of the examiner tends to establish and fairly presents in support of his claim or theory.

9. SAME—HYPOTHETICAL QUESTIONS.

Hypothetical questions are improper where based upon facts which have not been proved or offered to be proved or facts assumed are wholly irrelevant to the issue.

10. SAME—VALUE OF PROPERTY—ASSESSMENT FOR TAXATION.

In subsidence action against mining company, admission of evidence of assessment made for purposes of taxation *held*, not proof of real value.

11. DAMAGES—PERMANENT DAMAGES—REPARABLE DAMAGES—MEASURE OF DAMAGES.

In subsidence action against mining company for injury to plaintiff's house, measure of damages in case injury is permanent and irreparable is difference in market value before and after injury; if reparable the cost of making repairs and in either event should compensate only for injuries sustained up to the time of suit especially where evidence does not show beyond question that damages are bound to occur in the future.

12. SAME—MINES AND MINERALS—SUBSIDENCE—STABILIZATION—REPAIRS TO HOUSE.

Verdict of $12,500 for injuries to two-story, 12-room dwelling with stone foundation, brick veneer first story, frame second story, consisting of cracks in foundation and first story, because of subsidence due to defendant mining company's

· operations *held*, excessive, where it allows for total destruction of the property, takes no account of 22 years of depreciation, plaintiff was living there at time of trial, there is some evidence that stabilization has taken place and house may be repaired for $1,400.

13. Mines and Minerals—Subsidence—Damages—Successive Actions.

In action brought to recover damages for subsidence through loss of lateral support by mining operations on lands not adjoining property injured, the wrong done is allowing other land to fall and the cause of action does not arise until that occurs, not from mere excavation, hence a new action must be brought each time a new damage occurs even though all injuries result from the same or original act of defendant, so that jury has no right to consider damage which may ensue from probable or possible future subsidences or the fear that they might take place.

14. Appeal and Error—Damages—Remittitur.

In subsidence action against mining company for damages to plaintiff's home, judgment is affirmed and new trial denied conditioned upon remittitur of all in excess of $1,400, the cost of making repairs, without prejudice to right of plaintiff to bring action for damages for further subsidence, should it ever occur.

Appeal from Gogebic; Driscoll (George O.), J. Submitted April 2, 1935. (Docket No. 16, Calendar No. 37,341.)   Decided October 11, 1935.

Case by Thomas O'Donnell against Oliver Iron Mining Company, a corporation, for damages to plaintiff's dwelling alleged to be due to wrongful mining operations of defendant. Verdict and judgment for plaintiff. Defendant appeals. Modified and affirmed.

*Jones & Patek* (*John S. McDonald,* of counsel), for plaintiff.

*Charles M. Humphrey* and *Charles M. Humphrey, Jr.* (*Elmer F. Blu* and *Clarence J. Hartley,* of counsel), for defendant.

BUTZEL, J. Defendant appeals from a judgment of $12,500 rendered on the third trial of this case. At the first trial, the jury rendered a verdict for plaintiff for the sum of $17,500. The judge ordered a new trial and plaintiff was awarded a judgment of $8,500. This judgment was reversed on appeal. See *O'Donnell* v. *Oliver Iron Mining Co.,* 262 Mich. 470. It is well nigh impossible to encompass within the proper limits of an opinion all the facts and questions at issue in the instant case and set forth in two lengthy volumes of the record. We shall only give a brief résumé of the issues involved and refer to our former opinion in 262 Mich. 470, for such further facts as are not set forth herein. Plaintiff, the owner of a large residence on Ayer street in the city of Ironwood, Michigan, claims that there was a subsidence of the ground upon which his house stood, that this was caused by the mining operations of defendant and that as a result, large cracks have appeared in the house, particularly in the foundation walls where some stone has been displaced. He further claims that the house is in a damaged condition and that the subsidence will continue and completely ruin the house, and make the land worthless; that the property is a total loss except for such salvage as may be obtained through removal of the house and the two small garages on the lots. Plaintiff built the house in 1910 and 1911 on lots which he bought subject to the mineral rights, which his grantor retained. A part of the Gogebic Range, a large body of iron ore, is located under the city of Ironwood, Michigan. Three of defendant's mines are the Aurora, situated

at a considerable distance east of plaintiff's home; the East Norrie, somewhat nearer and south of the Aurora; and the North Norrie, south of plaintiff's property. There is some dispute as to how near the operations in the North Norrie mine came to plaintiff's property. It was somewhere between 1,400 and 2,400 feet south of the property.

In the early days of defendant's mining operations, the ore bodies were mined close to the surface. Immediately after the removal of the ore the ground settled directly over the mining operations. Shafts were also sunk directly into the ore formation and the removal of the ore caused the shafts to cave. Some 30 years ago, however, it became the practice of the defendant to sink the shafts in a vertical direction south of the foot walls in the quartz slate and more latterly in the granite. From these shafts cross cuts were driven northerly in the formation and various rises were used to connect the upper with the lower levels. Drifts on the sub-levels were timbered, but no more timber was used than was necessary to support the necessary openings, it being claimed that upon removal of the ore the overhanging rock, constituting the cave or the capping, settled and rock fell down so as to completely fill the cavity caused by the removal of the ore.

Defendant makes no argument as to whether negligence need be proved (see *Bator* v. *Ford Motor Co.,* 269 Mich. 648), but apparently admits that if its operations caused the subsidence it would be liable. The only questions brought up on appeal are questions of causation, evidence and damages.

1. *Causation.* It was conceded by defendant that there had been much subsidence in certain sections of the city of Ironwood due to the earlier methods of mining and that it made purchases of many parcels

of property that were thus damaged. It claims, however, that the subsidence never reached plaintiff's property and that the damage to his house was due entirely to the fact that the house was built over swampy ground and that poor mortar was used which caused a disintegration of the bond in the foundation stones so that the frost entered. The first crack was noticed several years before the beginning of the first trial, but plaintiff did nothing to repair it. Defendant claims that the failure of plaintiff to immediately repair the slight cracks that first appeared enabled frost and water to get into the crevices which, subjected to the bitter winter weather of the northern peninsula of Michigan, caused progressive damage from year to year.

Defendant also claimed that there was a large pillar of ore about 400 feet in width in the North Norrie mine, south of plaintiff's home and that a new shaft was sunk for the purpose of extracting this ore; that when in its mining operations the 12th level was reached, it became apparent that the ground began to subside towards the north, defendant ceased operating at that point in October, 1927, and that owing to this subsidence which the defendant insists never reached plaintiff's property, almost two million tons of ore were left intact and no mining has been carried on at that point since October, 1927.

From September, 1927, on, defendant's mining engineers began taking levels of all the surfaces to the northeast and northwest of the North Norrie mine and defendant claims that the figures prove that there was no subsidence as far north as plaintiff's property. In May, 1931, they obtained an elevation of 1,539.44 at point 22 which was in front of plaintiff's property and 1,545.58 at point 25 which is in front of the Baker property, a short distance west of plaintiff's property. In May, 1933, plaintiff's expert

witness, John M. Patek, took levels at the same two points, obtaining an elevation of 1,539.41 on point 22, and 1,545.55 on point 25. On the basis of the comparison of these elevations, Patek claimed that there was settlement of ⅜ths of an inch between 1931 and 1933 in front of plaintiff's property.

Defendant claims that such is not the fact. Defendant's engineers found an elevation of 1,539.43 on point 22 in May, 1933, or a decrease of only ⅛ of an inch, and 1,545.58 on point 25, which would show no decrease at all. Defendant further claims that the elevations as found by Patek are incorrect inasmuch as in taking his 1933 elevations he started from the elevation secured by defendant on point 17 in 1931 instead of the elevation at that point in 1933; that the elevation at point 17 in 1933 was ⅛ of an inch higher, and therefore if Patek had started with that elevation, as he should have done, the levels obtained by him on the other points would accordingly have shown a decrease of only 2/8ths rather than ⅜ths of an inch.

Defendant further claims that even if the readings showed a difference of ⅜ths of an inch, that does not show a subsidence of the ground in front of plaintiff's property, but is merely a natural variation in the reading resulting from different weather conditions at the time the elevations were taken, or perhaps from the fact that the rod was not held at the same angle. Defendant points out that although the elevations taken by it at the points on Ayer street in front of plaintiff's property, from September, 1928, to May, 1933, show slight variations up and down of anywhere from ⅛th to ⅜ths of an inch, there is no steady decline, and the average elevation obtained is the same throughout, the reading obtained in 1933 being the same as or higher than the original elevation found in 1928, that elevations taken in the gran-

ite area southeast of "D" shaft, where it is undisputed that no subsidence has taken place, show similar variations; but that elevations taken in the area where actual subsidence is admitted show a steady decline, with the 1933 reading showing a drop of as much as .43′ or 5 inches lower than the 1928 readings. Defendant claims that the elevations prove beyond any doubt that there has been no actual subsidence that reached plaintiff's property, and these physical facts cannot be overlooked or disputed. The difficulty is that while defendant's claim apparently seems quite convincing, nevertheless the readings are disputed and a question of fact was presented to the jury. It cannot be said that the jury went against the great weight of the evidence under the circumstances.

The case is replete with technical questions difficult for a layman to comprehend and we can readily see how a jury might have much difficulty in coming to a correct conclusion. There was, however, testimony to support plaintiff's claims. While we might have reached a different result were we a fact-finding body, we cannot say that the determination of the jury was against the overwhelming weight of the testimony.

2. *Evidence.* Many objections were made as to the plaintiff's evidence and its mode of presentation. In our former opinion in 262 Mich. 470, we held it error to admit testimony as to the subsidence caused by the Aurora mine which was a considerable distance from plaintiff's property since there was no showing that the operations in Aurora in any way affected plaintiff's property. In the trial of the present case, plaintiff's expert witness, Patek, testified that the mines were connected and that plaintiff's property was affected by the mining operations

in the Aurora. The judge instructed the jury to disregard the testimony except as it threw light on the general nature, character and position of the formation of the North Norrie and East Norrie mines and that there was not sufficient evidence to show that if a ground subsidence or movement due to the defendant's operations injured plaintiff's property, it was the result of any workings in the East Norrie property. The judge amply protected defendant and there was no error in receiving the testimony.

Testimony was also introduced in regard to the crack of the wall of the domestic science building, 500 feet southwest of plaintiff's property, and located on the south side of Ayer street. Objection was made to the introduction of this testimony unless it was shown that subsidence was due to defendant's mining operations. The testimony was allowed to stand for the time being with the understanding that plaintiff's counsel would connect up the cause of the cracks with the alleged subsidence which he claims caused plaintiff's damage. Not only was the testimony not connected up but other testimony showed that the wall in the domestic science building was built on quicksand. The judge properly ordered it excluded in his charge. Such testimony might have had some damaging effect notwithstanding its subsequent exclusion by the trial judge. It was, however, somewhat cumulative in character. The judge finally ordered the testimony stricken and we shall not reverse the case on this ground alone, although it does come close to reversible error.

Defendant shows that plaintiff made out his case almost entirely through the aid of John M. Patek, a witness who amply qualified as an expert, and acknowledged that he spent a great deal of time in working up the case and the evidence. He took a

very active part in the trial and acted more as a partisan than a disinterested engineering expert. His activity and zeal could not have been exceeded by plaintiff's own attorneys. This, however, did not disqualify him from testifying. His credibility and judgment as affected by his activity and interest in the case were for the jury to determine.

Objections were made to Patek's testimony on the ground that he was giving expert opinions not in response to hypothetical questions. In a number of answers, he said, "It is quite evident," etc. Counsel objected on the ground that the opinion was not based upon a hypothetical question, but the judge overruled the objection, stating, "We will have enough hypothetical questions." Patek not only testified as an expert but as a skilled observer of inspections he had made. Expert evidence by a professional observer can be brought out other than by hypothetical questions. *Kempsey* v. *McGinniss,* 21 Mich. 123, 138. When the court found that he was transgressing to the point where he was assuming facts, he finally ordered that a hypothetical question be framed and this was done. Defendant did not object, as perhaps it might have, that the witness was invading the province of the jury in giving conclusions instead of opinions. *DeGroot* v. *Winter,* 261 Mich. 660. Error may not be granted on account of the overruling of an objection when it is not made on proper grounds. *N. & M. Friedman Co.* v. *Atlas Assurance Co.,* 133 Mich. 212, and *Fremd* v. *Carleton,* 252 Mich. 389.

Further objection was made because a hypothetical question when finally submitted contained statements which defendant claims were untrue and unsupported by the testimony. It is true that some of the facts stated in the hypothetical question were in

dispute but that does not make the question improper if it fairly states such facts as the proof of the examiner tends to establish and fairly presents in support of his claim or theory. The rule is stated in *Herbeck* v. *Germain,* 144 Mich. 157, 160, as follows (2 Jones, Evidence [1st Ed.], § 373):

"If there is no testimony in the case tending to prove the facts assumed in the hypothetical question, such question is improper. The facts must be proved or offered to be proved; and if there is no evidence to prove such facts, or if the facts assumed in the interrogatory are wholly irrelevant to the issue, the question should be excluded. *The question is not necessarily to be rejected by the court although the facts assumed by counsel to be true are not proved,* or although the question does not state the facts as they actually exist. The facts are generally in dispute; and it is sufficient if the question fairly states such facts as the proof of the examiner tends to establish, and fairly presents his claim or theory. It cannot be expected that the interrogatory will include the proofs or theory of the adversary, since this would require a party to assume the truth of that which he generally denies. A question should not be rejected because it does not include all the facts, unless it thereby fails to present the case fairly."

Many other objections were made to the testimony as to cracks in other houses tending to show the general direction in which all of these cracks ran and their similarity to those in plaintiff's house. These presented questions of fact and defendant's objections go more as to the sufficiency and correctness of the testimony rather than to its admissibility.

3. *Damages.* The serious question, however, is the *quantum* of damages that may be recovered by plaintiff in the present action. The house was built in 1910 and 1911. It has six rooms on the ground

floor, six bedrooms on the second floor, as well as
bathroom, closets, etc.   There is a cellar underneath
the house with stone foundation walls upon which the
house rests.   The first story is brick veneer, the
second story frame.   Plaintiff and his family have
continuously resided in the house and were living in
it at the time of the trial, over 22 years after the
house was built, notwithstanding the claim in his
declaration filed in 1929 that the use and occupancy
of the house had been totally destroyed and rendered
valueless and useless.   Plaintiff, however, does claim
that the use and occupancy has become very unsafe
and hazardous and that his wife was awakened fre-
quently by loud noises that accompanied the move-
ment of the earth.   A photograph showing the west-
erly side of the house and made part of the record
impresses one that the house is in a remarkably good
state of preservation for a building over 22 years
old.   A slight crack does appear immediately above
the basement window in another photograph which
gives a closer view of the window.   Other photo-
graphs of the wall, particularly of the southwest cor-
ner and east wall of the basement taken from the in-
terior show serious cracks, with a displacement of
stone in the southwest corner.   Cracks in the walls
above the basement are such as might appear in a
house of this nature in a much more equable climate
far distant from defendant's mining operations.
The record does not show fissures or depressions in
the land.   The fact that it supports the house in its
present condition shows that it still has value.   There
is testimony showing that the house can be repaired
and restored to good condition for the sum of ap-
proximately $1,400.   The entire property with im-
provements originally cost far less than the amount
of the damages awarded.   This does not take into

consideration such deterioration and depreciation as is bound to take place in a house over a period of years. For tax purposes the property was assessed for $3,650 although this is not proof of real value. The testimony of the realtors who testified as experts, some with apparently no experience in the sale of this type of property, justifies the amount awarded by the jury, based upon the total destruction of the property, less a small sum for salvage. The query, however, is whether the plaintiff at this time may recover more than the cost of repairs amounting to approximately $1,400. It is conceded that the amount of the award is largely based on prospective damages. The query arises, where there has not been a total destruction of the property and the injury is due to the withdrawal of the lateral supports through mining operations, not subjacent or adjacent to the property in question, but a considerable distance therefrom, may prospective damages be awarded. The correct rule is stated in *O'Donnell v. Oliver Iron Mining Co.,* 262 Mich. 470, 477, as follows:

"The court instructed the jury that, if it found that the injury to plaintiff's property was caused by defendant's negligence, the damages should represent the difference between the market value of the house at the date of the injury and that value it would have had if the property had remained undamaged. This is the measure of recovery only where the injury is permanent. No instruction was given as to what the measure of damages should be in case the jury found the injuries were reparable, nor did defendant make any showing as to the cost of full restoration and repair of the house. Apparently, plaintiff tried the case on the theory that the damage was permanent and irreparable. Nevertheless, if defendant shows that the property can be repaired and

restored to the condition it would have been in had it not been damaged by the subsidence, and also gives proper testimony as to the cost of the repairs, the court should make it clear to the jury that the question as to the permanency of the damage, and, if reparable, the cost of repairs, is one of fact for them to decide, if they conclude that defendant was responsible for the damages. The correct rule is stated in *Berkey* v. *Berwind-White Coal Mining Co.*, 229 Pa. 417 (78 Atl. 1004), where the court said:

" 'The twelfth assignment relates to the measure of damages. The learned judge correctly disposed of the matter covered by this assignment. He distinctly told the jury that if the injury was reparable or curable with reasonable effort and expense less than the value of the property, the measure of damages was what it would cost to make the repairs. He further instructed them that there had been no proof offered by the plaintiff of what it would cost to make the repairs and "if it is reparable, there being no proof of the cost of repair, you cannot allow for it." He also told the jury in answer to a point, and very properly so, that if the injury was permanent the measure of damages was the difference in the market value of the farm before and after the injury inflicted by the mining operations. The assignment is dismissed.' "

However, no matter whether the injury is permanent or reparable, the damages awarded should only compensate for the injuries sustained up to the time of suit, and not for future or prospective injuries. We do not lay down any rule for the case in which it clearly appears beyond any question that the damages, although *in futuro,* are bound to occur. It suffices that the instant case is not such a one. The sole testimony offered by plaintiff showing that the subsidence will continue in the future is that of witness Patek who testified that subsidence will continue indefinitely for a good many years to come. James H. Goudie, the other expert witness for plaintiff, was far more conservative in his opinions. He stated the subsidence would continue until the ground became stabilized and that, as far as he knew, it might already have reached the point of stability. The other

witnesses for plaintiff all based their answers upon what would happen if the subsidence continued. Defendant, on the other hand, showed that even if there had been any subsidence, stability had been reached and that in other places in Ironwood where houses had been purchased and repaired, no subsidence had appeared after a considerable lapse of time. Defendant, by the jury's verdict, would be called upon to pay damages for the total destruction of the property and plaintiff would be able to continue to live in it and own and enjoy it even though no further subsidence occurred. Even though the subsidence was due to defendant's mining operations, we nevertheless see the manifest injustice in holding the defendant liable for something which plaintiff has not proven will happen beyond any question. If the defendant is liable, he ought only to pay the damages as they occur. The question of damages for subsidence in mining cases is new in this State, but it is well presented by the facts in the instant case.

We are indebted to counsel for very thorough briefs showing the authorities in other jurisdictions. We base our conclusion not only on what is equitable and just under the circumstances, but also on the rule firmly established in England and adopted in many of the States although possibly not in the majority of them. Some difficulty arises because many of the cases cited distinguish between the removal of subjacent supports, the withdrawal of lateral support through the excavation of adjoining land and subsidence occasioned through excavations, particularly in a mining district, of property not adjoining the parcel damaged. There is much variance in the decisions and we shall limit our discussion to the situation as it presents itself in the instant case. The English rule is that prospective damages may

not be recovered in such an action and that a new action must be brought each time a new damage occurs even though all injuries result from the same or original act of defendant. The cause of action does not arise from the mere fact of excavations, but only when damage occurs to plaintiff's land. *Backhouse* v. *Bonomi,* 9 H. L. Cas. 563 (34 L. J. Q. B. 181, 4 L. T. 754).

In *Lamb* v. *Walker,* 47 L. J. Q. B. 451 (3 Q. B. Div. 389, 38 L. T. 643), a divided court came to a contrary conclusion, but the dissenting opinion of Cockburn, C. J., well expresses the law that subsequently became and is the prevailing law of England. He said:

"This being so, it appears to me not only logically, but practically, inconsistent with this principle to hold that, because an adjoining owner has sustained actual damage to a limited extent, from excavation of adjoining soil, he can recover in the same action not only in respect of damage actually sustained, but also in respect of prospective damage which has not yet arisen, and which possibly never may arise at all. If permitted to do so he would thus be entitled to recover compensation in respect of a wrong which he has not as yet sustained, a wrong as yet undeveloped and which has not yet in the legal view of the matter come into existence, a proceeding at variance with all principle. Equally at variance with principle is it, when it is borne in mind that it is only by reason of and to the extent of realized damage that the act of the defendant becomes wrongful, to hold him responsible for that which, though it may possibly become wrongful hereafter, as yet is not so. * * *

"In a matter depending, as I think this does, on legal principles, considerations of convenience or inconvenience can scarcely be admitted. At the same time I am not insensible to the inconvenience which may result to a defendant from being exposed to successive actions as fresh damage may arise. But independently of the fact that in many instances he

may, by recourse to artificial means, prevent further subsidence, there are other considerations of convenience by which this inconvenience to the defendant may well be counterbalanced.  If on an action being brought for damages which has actually occurred, it were necessary to go into the question of possible future damages where there was a possibility of such damage arising, both parties would be exposed to the inconvenience of a speculative inquiry, depending on the uncertain and often unsatisfactory evidence of experts—a consideration which appears to have had considerable weight in determining the decision of the Exchequer Chamber in *Bonomi* v. *Backhouse,* E. B. & E. 646 (120 Eng. Rep. 652).  'The jury, according to this view,' says Mr. Justice Willes, 'would have to decide the speculative question whether any damage was likely to arise; and it might well be that in many cases they would, upon the evidence of mineral surveyors and engineers, find that no damage was likely to occur when the most serious injury might in fact occur, and in others find and give large sums of money for apprehended damage which in point of fact never might arise,' 'This,' adds the learned judge, 'is certainly not a state of the law to be desired.  In many cases damages would be given where none could be sustained, while they would in other cases be given where they ought to be withheld.'  In this view I entirely concur.  Nothing I think could be more unsatisfactory than an inquiry into the possible future effect of underground operations, or more uncertain than its result, depending, as it must do, on the opinion of experts taking the widest range, as dealing with the unknown future, with the elasticity which generally characterizes the formation of professional opinion as exhibited in courts of justice.  Yet if the proposed doctrine is to be sustained, it is obvious that, in every case in which an action is brought in respect of actual damage, it will be necessary to go into the question of prospective or speculative damage, as, if the doctrine I am deal-

ing with is correct, the plaintiff having brought an action, would be forever shut out from bringing another on account of subsequent damage if such damage should afterwards occur."

In a later case, *West Leigh Colliery Co.* v. *Tunnicliffe & Hampson,* 77 L. J. Ch. 102 (98 L. T. 4, 24 T. L. R. 146), the dissenting opinion of Cockburn in *Lamb* v. *Walker, supra,* was followed. Lord Ashburn stated:

"The excavations in themselves give no right of action. It is only the damage caused to the respondents' right of enjoyment of their property by a subsidence caused by the excavations that gives any right of action. Before any subsidence it might be that the known excavations and the fears resulting therefrom would cause a depreciation in the value of the property for which no action would lie.. The fear of a subsidence, although founded on the known fact of extensive excavations, cannot give any cause of action, even although there may have been already a subsidence. * * * An owner can bring a fresh action for the damage caused by each fresh subsidence, but he cannot recover anything for the risk of future damage. To give damages for depreciation, because a purchaser, from fear of future damage, would give less after the subsidence, would be a method of doing that which the law as laid down in this house would not sanction."

The Lord Chancellor (Loreburn) stated:

"To say that the surface lands would sell for less because of the apprehension of future subsidence is, no doubt, true. To say that the depreciation in present value caused by that apprehension ought to be included as an element of compensation is, in my view, unsound. For that is asking compensation, not for physical damage which has in fact been caused, but for the present influence on the market

of a fear that more such damage may occur in future.''

The reasoning seems so sound and is so applicable to the instant case that we adopt it in coming to our conclusions.  The authorities in the country are at variance.  In *Catlin Coal Co.* v. *Lloyd,* 109 Ill. App. 122, as well as on a new trial of the same case, the court held that the jury had no right to consider the probability or possibility of the future sinking or subsidence that might thereafter occur.

In *Morris* v. *Saline County Coal Co.,* 211 Ill. App. 178, the court held that successive suits for damages might be brought from time to time as the damages were sustained.

In *Pever* v. *Railroad Co.,* 100 Kan. 266 (164 Pac. 159), the court held:

''In case of subsidence resulting from causes the operation of which is concealed from observations and the results of which cannot clearly be foreseen, as from mining, recovery for future injury is impossible, and each new caving gives rise to a new cause of action.''

In *Jackson Hill Coal & Coke Co.* v. *Bales,* 183 Ind. 276 (108 N. E. 962), the court held that plaintiff was not entitled to any prospective damages but only for those that have already accrued.

In *Pollock* v. *Railroad Co.,* 275 Pa. 467 (119 Atl. 547, 26 A. L. R. 1232), the court held:

''The weight of authority throughout the United States supports the principle that a landowner does not suffer damages until the earth is so much disturbed that it slides or falls, as the actionable wrong is not the excavation, but the act of allowing the other land to fall.  The statute of limitations begins to run from the actual occurrence of the mischief, which is the sliding of the earth, not from the time

of excavation. It follows logically that successive actions may be brought for each slipping or falling of the soil, though only one excavation is made. 68 L. R. A. 691, 693, notes; 1 R. C. L. p. 389. It may be likened to an illegal diversion of water, which gives rise to successive actions because of the continuing character of the trespass; each taking is a new offense. *Standard Plate Glass Co.* v. *Butler Water Co.,* 5 Pa. Super. Ct. 563, 577. As the case is presented by appellant, the court was clearly right in entering judgment for appellee on the verdict.''

See, also, 35 A. L. R. 1145, 56 A. L. R. 313.

In order to arrive at the amount of the award the jury could not have taken into consideration the cost of repairs but must have believed that the subsidence would continue until the property would be worthless. It may also have considered what the effect of the fear of further subsidence would have upon the sale of his property, whether anyone would care to purchase the house located on such land or in the event of the removal of the house, build upon such land when there is fear that the buildings might crack due to further subsidence. Such damaging effect on the sale of the property is not sufficient to make us depart from the rule just announced. It is purely a matter of speculation, as we have shown, as to whether any further subsidence will occur, notwithstanding the testimony of plaintiff's expert. The house *can* be repaired in accordance with the testimony for $1,400, or thereabouts. If plaintiff applies such sum as is awarded him for repairs and there is further subsidence, he may recover for such damages as he may suffer, which are caused by defendant's operations, past, present or future. This seems to be the just rule notwithstanding the fact that plaintiff may be put to the expense of additional suits and the possible depreciation of the value of

the property because of fear of future subsidence testified to by plaintiff's expert, although defendant shows stabilization of the ground. If further subsidence does not occur, plaintiff has his house in good condition notwithstanding the deterioration and depreciation that is bound to occur in property over a score of years.

It is quite evident that unless the house is repaired frost and water will do further damage. Considering the testimony in regard to repairs in the most favorable light to plaintiff, and making full allowance for all damages he has suffered, we believe he should be entitled to recover $1,400. The plaintiff must file a remittitur so as to reduce the judgment to $1,400 within 30 days or a new trial is granted. If filed the judgment thus reduced will be affirmed, but without prejudice as to the right of plaintiff to bring actions for damages caused by further subsidence, should it ever occur, after plaintiff has fully and properly repaired the house. Defendant will recover costs in this court.

The case is remanded to the trial court with instructions to enter a judgment in accordance with this opinion.

POTTER, C. J., and NORTH, FEAD, WIEST, BUSHNELL, and EDWARD M. SHARPE, JJ., concurred. NELSON SHARPE, J., did not sit.